**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ————————————————— : | | |
| HORIZON MEDICINES LLC and NUVO : | **Civil Action No. 15-3324 (SRC)** | |
| PHARMACEUTICAL (IRELAND) : | | |
| DESIGNATED ACTIVITY COMPANY, : | | |
| : | **OPINION & ORDER** | |
| Plaintiffs, : | | |
| : | | |
| v. : | (consolidated for discovery | |
| : | purposes with Civil Action | |
| DR. REDDY'S LABORATORIES, INC. : | Nos. 16-4918, 15-3327, | |
| and DR. REDDY'S LABORATORIES, : | 16-4921, 15-3326, | |
| : | and 16-4920) | |
| Defendants. : | | |
| —————————————————: | | |

**CHESLER, U.S.D.J.**

This matter comes before the Court on the application for claim construction by Plaintiffs Horizon Medicines LLC and Nuvo Pharmaceutical (Ireland) Designated Activity Company (collectively, "Horizon") and Defendants Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd. (collectively, "DRL.")   These consolidated cases arise from Hatch-Waxman litigation regarding patents related to the drug Vimovo®.   Plaintiff Nuvo owns the patents, Plaintiff Horizon is a licensee, and Defendants are pharmaceutical companies which have filed ANDA applications to produce generic versions.   The first round of litigation involved U.S. Patent Nos. 6,926,907 and 8,557,285.[1]   Those patents have been found to be invalid for failure to satisfy the written description requirement.   Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc., 923 F.3d 1368, 1371 (Fed. Cir. 2019).

During the first round of litigation, nine additional patents related to Vimovo® issued and

were listed in the Orange Book, and the instant cases arose. The two patents presently at issue descend from U.S. Patent No. 6,926,907: U.S. Patent Nos. 8,858,996 (the "'996 patent") and 9,161,920 (the "'920 patent"). The parties seek claim construction of terms in these two patents.

## ANALYSIS

I. **The law of claim construction**

A court's determination "of patent infringement requires a two-step process: first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." Acumed LLC v. Stryker Corp., 483 F.3d 800, 804 (Fed. Cir. 2007). "[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law." Teva Pharms. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 841 (2015).

The focus of claim construction is the claim language itself:

> It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude. Attending this principle, a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1115-1116 (Fed. Cir. 2004) (citations omitted).

The Federal Circuit has established this framework for the construction of claim language:

> We have frequently stated that the words of a claim 'are generally given their

---

[1] This round of litigation involved Civil Action Nos. 11-2317, 11-4275, 13-91, and 13-4022.

ordinary and customary meaning.'   We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.
The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. . .

In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.   In such circumstances, general purpose dictionaries may be helpful.   In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.   Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

Phillips v. AWH Corp., 415 F.3d 1303, 1312-1314 (Fed. Cir. 2005) (citations omitted).

## II.    Claim construction of the disputed terms

The parties dispute the construction of three claim terms which appear in a much larger set of claims in the two patents at issue.   The first dispute concerns the preamble of claims 1-5, 7-9, and 11-14 in the '920 patent.   The '920 patent has two independent claims:

1.    A method of reducing the incidence of NSAID-associated gastric ulcers in a patient requiring chronic NSAID treatment and who is at risk of developing an NSAID-associated ulcer, wherein the method comprises administering to said patient in need thereof a pharmaceutical composition in unit dose form in the form of a tablet, said composition comprising: naproxen in an amount of 200-600 mg per unit dosage form; and esomeprazole in an amount of from 5 to 100 mg per unit dosage form, wherein upon introduction of said unit dosage form into a medium, at least a portion of said esomeprazole is released regardless of the pH of the medium, and release of at least a portion of said naproxen is inhibited unless the pH of said medium is 3.5 or higher.

3

11.    A method of reducing the incidence of NSAID-associated gastric ulcers in a patient requiring chronic NSAID treatment and who is at risk of developing an NSAID-associated ulcer, wherein the method comprises administering to said patient in need thereof a pharmaceutical composition in unit dose form in the form of a tablet, said composition comprising: a core layer comprising naproxen, wherein said core layer has a coating that inhibits release of said naproxen from said core layer unless said dosage form is in a medium with a pH of 3.5 or higher; and a layer comprising esomeprazole, wherein said layer is has a non-enteric film coating that, upon ingestion by a patient, releases said esomeprazole into the stomach of said patient.

DRL begins its claim construction analysis by linking the preambles in the claims just quoted to the statements of purpose in the '920 patent.   The first sentence in the "Summary of the Invention" is: "The present invention is based upon the discovery of a new method for reducing the risk of gastrointestinal side effects in people taking NSAIDs . . ."   '920 Patent, col. 3 ll.15-17.   DRL also points to the preambles in the claims themselves (only in the '920 patent): "A method of reducing the incidence of NSAID-associated gastric ulcers in a patient requiring chronic NSAID treatment and who is at risk of developing an NSAID-associated ulcer. . ."   On this evidence, DRL argues that the purpose of the invention of the '920 patent is the reduction of the risk of gastrointestinal side effects in people taking NSAIDS, and that this purpose cannot be achieved in the absence of the portion of the esomeprazole having the property of being effective to raise gastric pH to at least 3.5.   As the quoted claims show, the preamble language in the two independent claims at issue in the '920 patent is identical.   Horizon contends that the preambles do not limit the claims.

The Court finds DRL's position on the preamble to be confused and problematic.   In DRL's amended opening brief, only two paragraphs, and one appendix, address claim construction of the preamble.   The two paragraphs, on pages 13 and 14, make a brief argument for construing the preamble as limiting.   In the first paragraph, footnote 7 points to Appendix II.

4

This appendix, however, proposes a very different construction.

Attached at the end of the opening brief is Appendix II, with the title, "APPENDIX II – Chart of Disputed Claim Construction Terms."   The third column is labeled, "Defendants' Proposed Construction."   In the row that presents the preamble issue, the third column reads: "Preamble is limiting; 'A method of reducing the incidence of NSAID associated gastric ulcers, *as compared to enteric coated naproxen*, in a patient requiring chronic NSAID treatment and who is at risk of developing an NSAID associated ulcer.'"[2]   The Court observes that the language here inside the single quotation marks is not the same language as the preamble at issue.   Defendants have proposed a construction in which they have added the italicized phrase to the preamble language.   Thus, presently before this Court is an opening brief with an argument in two paragraphs that the preamble should be construed as limiting, and an appendix with a proposed construction which is not the preamble.   The proposed construction does not match the argument in the brief.

More puzzling, still, is the absence from the brief of any justification for the proposed amendment to the preamble language.   Nor does DRL's responsive brief shed any light on this puzzle.   DRL has thus proposed a claim construction for which it has made no argument, and an argument that is disconnected from its construction.   The Court rejects DRL's position that the proposed amended preamble is limiting for failure to provide any basis for writing new language into the claims.[3]

---

[2]  The proposed construction in Appendix II matches DRL's proposed construction in the Joint Claim Construction and Prehearing Statement.   (Docket Entry No. 280 at 3.)

[3]  As Justice Bradley famously wrote: "Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express."   White v. Dunbar, 119 U.S. 47, 51 (1886).

Moreover, even if this Court interpreted DRL's brief to argue that the unmodified preamble limits the claims, DRL has failed to persuade that this is proper under Federal Circuit law. Instead, Horizon is correct that the preambles are merely statements of intended purpose, which introduce a structurally complete invention and do not limit the claims. <u>TomTom, Inc. v. Adolph</u>, 790 F.3d 1315, 1323 (Fed. Cir. 2015) ("a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.")

The second and third disputes over claim construction involve DRL's proposal that this Court should construe all the claims at issue, in both the '920 and '996 patents, to require effective esomeprazole, and thus to import a limitation from the specification.[4] The '996 patent has two independent claims:

1.    A pharmaceutical composition in unit dosage form in the form of a tablet, said composition comprising: naproxen in an amount of 200-600 mg per unit dosage form; and esomeprazole in an amount of from 5 to 100 mg per unit dosage form, wherein upon introduction of said unit dosage form into a medium, at least a portion of said esomeprazole is released regardless of the pH of the medium, and release of at least a portion of said naproxen is inhibited unless the pH of said medium is 3.5 or higher.

12.    A pharmaceutical composition in unit dosage form in the form of a tablet, said composition comprising: a core layer comprising naproxen, wherein said core layer has a coating that inhibits release of said naproxen from said core layer unless said dosage form is in a medium with a pH of 3.5 or higher; and a layer comprising esomeprazole, wherein said layer is has a non-enteric film coating that, upon ingestion by a patient, releases said esomeprazole into the stomach of said patient.

Horizon contends that the claims at issue have their plain, ordinary meaning, and that no construction is needed. DRL proposes that the independent claims should be construed so as to

---

[4] Because this Court has just rejected DRL's construction of the preambles, when this Opinion hereafter refers to DRL's proposed construction, this refers only to DRL's proposal that the

add "effective to raise gastric pH to at least 3.5" to the esomeprazole release claim terms.   Thus, DRL proposes that the language in claim 1 in both the '920 and '996 patents should be construed to mean: at least a portion of said esomeprazole is released regardless of the pH of the medium, *and is effective to raise gastric pH to at least 3.5*.[5]   DRL proposes that the language in claim 11 of the '920 patent and claim 12 of the '996 patent should be construed to mean: a layer comprising esomeprazole, *effective to raise gastric pH to at least 3.5.*

DRL points to the fact that all of the claims presently at issue contain language relating to the release of esomeprazole.   DRL argues that, in light of the intrinsic evidence, these terms should be construed to require that the esomeprazole be effective to raise the gastric pH to at least 3.5.   More specifically, DRL points to the terms which generally state the quantum of esomeprazole, "a layer comprising esomeprazole" and "at least a portion of said esomeprazole," and proposes that these terms should be construed so as to additionally require that the layer and the portion, whichever appears in a particular claim, must be effective to raise the gastric pH to at least 3.5.

There appears to be no dispute that the specifications of the '996 and '920 patents are the same.   Because of this, for convenience, this Opinion will refer to and cite as "the Specification" the specification of the '996 patent only, with the understanding that the corresponding citations to the specification of the '920 patent are included within the meaning of "the Specification."

Roughly speaking, DRL's argument has two component parts: 1) the evidence of record demonstrates that the invention has certain characteristics; and 2) under Federal Circuit law, the claim language at issue should be construed to require those characteristics.   As will be seen in

---

Specification limits the claims at issue.
[5] In these examples, the non-italicized words are the original words in the claim, and the

the discussion that follows, the analysis of the intrinsic evidence is fairly straightforward.   More

challenging is the question of whether DRL has a valid theory under Federal Circuit law to

justify construing the claim language to include limitations derived from the intrinsic record.

> A.    *The intrinsic evidence: what did the inventor actually invent?*

The Federal Circuit has held:

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.   A claim construction is persuasive,
> not because it follows a certain rule, but because it defines terms in the context of
> the whole patent.

Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations

omitted).   This is key to this Court's claim construction analysis.

> 1.    The prosecution history

DRL contends that the prosecution history of the patents at issue supports the proposed

construction.   First, DRL points out that the '996 and '920 patents were allowed with terminal

disclaimers over the '285 patent, and then states: "This would not have been the case if the

Patent Office thought the Asserted Claims presented something new."   (Defs.' Br. 19.)   Second,

DRL argues that, "when Plaintiffs added two new independent claims in preliminary

amendments that ultimately issued as Claims 1 and 12 of the '996 patent," the applicants stated

that these claims had "support" in a specification statement that said that the present invention

has an acid inhibitor present in an amount effective to raise the gastric pH of a patient to at least

3.5.   (Defs.' Br. 20.)   Neither of these arguments has been developed sufficiently to be

persuasive.

---

italicized words show what DRL proposes should be added.

2.    The specification

As to the evidence in the Specification, DRL begins by pointing to the statements in the specification which describe "the present invention" as having an effective acid inhibitor.   The Abstract for both the '920 and '996 patents states:

> The present invention is directed to drug dosage forms that release an agent that raises the pH of a patient's gastrointestinal tract, followed by a non-steroidal anti-inflammatory drug. The dosage form is designed so that the NSAID is not released until the intragastric pH has been raised to a safe level.   The invention also encompasses methods of treating patients by administering this coordinated release, gastroprotective, antiarthritic/analgesic combination unit dosage form to achieve pain and symptom relief with a reduced risk of developing gastrointestinal damage such as ulcers, erosions and hemorrhages.

The Abstract alone strongly supports DRL's proposed construction: in the first two sentences, it states that the "present invention" is directed to "drug dosage forms" that are "designed so that the NSAID is not released until the intragastric pH has been raised to a safe level."   In the third sentence, it expands the scope of the "present invention" to include methods of treating patients in which the "dosage form" is administered, and characterizes the "dosage form" as "gastroprotective" and having "coordinated release."

The title of the '996 patent is: "Pharmaceutical compositions for the coordinated delivery of NSAIDS."   Considered together, the title and the Abstract teach that a characteristic of the invention as a whole is "coordinated" delivery and release, which involve a dosage form designed so that, first, an agent is released that raises the pH of a patient's gastrointestinal tract and, second, the NSAID is not released until intragastric pH has been raised to a safe level. Thus, the patent title and Abstract state the essence of the invention and lay out all the principal elements.   The only important pieces missing from the Abstract are what the pH-raising agent is and what that safe level is, which, as the following discussion will show, the Specification

consistently states are acid inhibitors, and a level of at least pH 3.5.[6]

The specification for both the '920 and '996 patents states:

- The present invention is directed to pharmaceutical compositions that provide for the coordinated release of an acid inhibitor and a non-steroidal anti-inflammatory drug (NSAID). '996 patent, col.1 ll.25-28.

- The present invention is based upon the discovery of a new method for reducing the risk of gastrointestinal side effects in people taking NSAIDs for pain relief and for other conditions, particularly during chronic treatment. The method involves the administration of a single, coordinated, unit-dose product that combines: a) an agent that actively raises intragastric pH to levels associated with less risk of NSAID-induced ulcers; and b) an NSAID that is specially formulated to be released in a coordinated way that minimizes the adverse effects of the NSAID on the gastroduodenal mucosa. '996 patent, col.3 ll.15-24.

- The present invention is based upon the discovery of improved pharmaceutical compositions for administering NSAIDs to patients. In addition to containing one or more NSAIDs, the compositions include acid inhibitors that are capable of raising the pH of the GI tract of patients. '996 patent, col.6 ll.23-27.

These statements support DRL's assertion that the specification repeatedly describes "the present invention" as containing an acid inhibitor that raises the pH of the gastrointestinal tract prior to the release of the NSAID. DRL contends that, under Federal Circuit law, such language may bind claim scope, citing Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1398 (Fed. Cir. 2008), in which the Federal Circuit held:

We agree with Netcraft that use of the phrase "the present invention" does not "automatically" limit the meaning of claim terms in all circumstances, and that such language must be read in the context of the entire specification and prosecution history. For the reasons below, however, we agree with the district court that the common specification's repeated use of the phrase "the present invention" describes the invention as a whole, and, as will be discussed further

---

[6] Moreover, the claims themselves all expressly state that the naproxen does not release unless in a medium with a pH of 3.5 or higher. When read in the context of a Specification that discloses "coordinated" release, for the release to be coordinated, the gastric pH must be raised to at least this level. The patent teaches no other way for the release of the two active ingredients to be coordinated.

below, that the prosecution history does not warrant a contrary result.

Id. (citation omitted).   DRL also cites Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d

1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present

invention' as a whole, this description limits the scope of the invention") and Honeywell Int'l,

Inc. v. ITT Indus., 452 F.3d 1312, 1318 (Fed. Cir. 2006) (finding that repeated use of "the

present invention" in the specification characterized the invention as a whole and limited a key

claim term).   See also Sony Corp. v. Iancu, 924 F.3d 1235, 1241 (Fed. Cir. 2019) (quoting

Verizon.)

      As already noted, the patent title and Abstract refer to "coordinated" delivery and release.

The rest of the Specification confirms that a key characteristic of the invention as a whole is

"coordinated" release.   In addition to the title and the Abstract, this appears in the "Field of the

Invention" ("The present invention is directed to pharmaceutical compositions that provide for

the coordinated release of an acid inhibitor and a non-steroidal anti-inflammatory drug

(NSAID);" '996 patent, col 1.ll.25-28); as a characteristic that distinguishes the prior art in the

"Background of the Invention" ("these suggestions do not provide for coordinated drug release

or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID;" '996

patent, col 2.ll.34-36); the first paragraph of the "Summary of the Invention" ("The method

involves the administration of a single, coordinated, unit-dose product that combines: a) an agent

that actively raises intragastric pH to levels associated with less risk of NSAID-induced ulcers;

and b) an NSAID that is specially formulated to be released in a coordinated way that minimizes

the adverse effects of the NSAID on the gastroduodenal mucosa;" '996 patent, col 3.ll.18-24);

and the first paragraph of the "Detailed Description of the Invention" ("All of the dosage forms

are designed for oral delivery and provide for the coordinated release of therapeutic agents, i.e.,

for the sequential release of acid inhibitor followed by analgesic;" '996 patent, col 6.ll.27-30). The last example in this string of examples could not state this any more clearly: *all* of the dosage forms provide for *coordinated release*, which is then defined as discussed above.   The invention as a whole requires coordinated release, the sequential release of acid inhibitor followed by analgesic.   If the claims all require that the analgesic, naproxen, is not released unless until the medium has a pH of at least 3.5, and coordinated release here means sequential release with the acid inhibitor releasing first, the Specification teaches only one way to achieve this: the acid inhibitor must raise the pH of the medium to at least 3.5, at which point, the enteric-coated analgesic releases.

Having considered these general points, the Court next examines the subsections of the Specification in order.   As already discussed, the "Field of the Invention" states that the "present invention" is directed to compositions that provide for the coordinated release of the acid inhibitor and NSAID.   It then states that such compositions have a reduced likelihood of causing gastrointestinal side effects, which is the gastroprotective characteristic of the invention.   These are statements about the invention as a whole.

Next is the "Background of the Invention" subsection.   In this section, DRL highlights the significant criticism of the prior art.   In the "Background of the Invention" section, the specification states:

> Recognizing the potential benefits of PPIs for the prevention of NSAID-induced gastroduodenal damage, others have disclosed strategies for combining the two active agents for therapeutic purposes. However, these suggestions do not provide for coordinated drug release or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID (U.S. Pat. No. 5,204,118; U.S. Pat. No. 5,417,980; U.S. Pat. No. 5,466,436; and U.S. Pat. No. 5,037,815).

'996 patent, col.2 ll.31-38.   These statements make clear that the inventor distinguished and

12

criticized formulations that "do not provide for coordinated drug release or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID."

The significance of this is deepened by considering the teachings in the "Background of the Invention" about the problem the prior art was trying to solve.   The subsection begins as follows:

> Although non-steroidal anti-inflammatory drugs are widely accepted as effective agents for controlling pain, their administration can lead to the development of gastroduodenal lesions, e.g., ulcers and erosions, in susceptible individuals. It appears that a major factor contributing to the development of these lesions is the presence of acid in the stomach and upper small intestine of patients. This view is supported by clinical studies demonstrating an improvement in NSAID tolerability when patients are also taking independent doses of acid inhibitors (Dig. Dis. 12:210-222 (1994); Drug Safety 21:503-512 (1999); Aliment. Pharmacol. Ther. 12:135-140 (1998); Am. J. Med. 104(3A):67S-74S (1998); Clin. Ther. 17:1159-1173 (1995)). Other major factors contributing to NSAID-associated gastropathy include a local toxic effect of NSAIDs and inhibition of protective prostaglandins (Can. J. Gastroenterol. 13:135-142 (1999) and Pract. Drug Safety 21:503-512, (1999)), which may also make some patients more susceptible to the ulcerogenic effects of other noxious stimuli.

'996 patent, col.1 ll.35-52.   Thus, a "major factor" contributing to the development of gastroduodenal ulcers, in patients using NSAIDS for controlling pain, is "the presence of acid in the stomach."   Also, NSAIDS have "a local toxic effect" which increases the ulcerogenic effects of other noxious stimuli.

The Background subsection proceeds to explain that acid inhibitors can be protective during administration of NSAIDS.   '996 patent, col.1 ll.53-58.   There are, however, problems of timing and coordination: simply put, some acid inhibitor/NSAID formulations do not optimize gastric protection.   It is at this point that the Specification distinguishes and criticizes prior art strategies which "do not provide for coordinated drug release or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID."   '996 patent, col.2 ll.34-36.   After

13

discussing other unsuccessful prior art strategies, the inventor concludes the "Background of the Invention" section with this statement: "Overall, it may be concluded that the risk of inducing GI ulcers is a recognized problem associated with the administration of NSAIDs and that, despite considerable effort, an ideal solution has not yet been found."   '996 patent, col.3 ll.8-11.

The point here is that the "Background of the Invention" states that the problem to be solved concerns the ulcerogenic effects of NSAIDs on the gastrointestinal tract, and that the prior art has failed to "provide for coordinated drug release or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID."   '996 patent, col.2 ll.34-36.   This is crucial to understanding what the inventor actually invented.   Thus, a formulation which does not provide for coordinated drug release or for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID, falls within the scope of the criticized prior art, and not within the scope of the invention.

The statements of criticism, in the context of the Specification statements about the problems with NSAID-induced gastrointestinal damage in prior art formulations, demonstrate that the inventor also distinguished the invention from the prior art on the ground that the invention is gastroprotective and has a reduced likelihood of causing gastrointestinal side effects. If the claims cover NSAID formulations in which the acid inhibitor is <u>not</u> effective to raise the gastric pH to at least 3.5, they include within their scope prior art formulations which do <u>not</u> have coordinated release or a reduced likelihood of causing gastrointestinal side effects.   This would be contrary to what the inventor wrote was the key benefit of the invention.

Next is the "Summary of the Invention" subsection.   This section is drafted in a way that reflects the dual nature of the invention: it involves both a composition and a method of using that composition.   The subsection begins with a broad statement that, as already noted, describes

14

the discovery which underlies the present invention:

> The present invention is based upon the discovery of a new method for reducing the risk of gastrointestinal side effects in people taking NSAIDs for pain relief and for other conditions, particularly during chronic treatment. The method involves the administration of a single, coordinated, unit-dose product that combines: a) an agent that actively raises intragastric pH to levels associated with less risk of NSAID-induced ulcers; and b) an NSAID that is specially formulated to be released in a coordinated way that minimizes the adverse effects of the NSAID on the gastroduodenal mucosa. Either short or long acting acid inhibitors can be effectively used in the dosage forms. This method has the added benefit of being able to protect patients from other gastrointestinal ulcerogens whose effect may otherwise be enhanced by the disruption of gastroprotective prostaglandins due to NSAID therapy.

'996 patent, col.1 ll.15-30.   This paragraph gives the world the summary of what the inventor discovered.   The foundation is the discovery of a gastroprotective method for treating patients with pain who are taking NSAIDS.   That method involves a product in a single dose that coordinates two elements: an agent that raises intragastric pH to levels which are gastroprotective, and an NSAID with a coordinated release characteristic, which has gastroprotective effect.   This paragraph emphasizes the gastroprotective and coordinated release characteristics of the method that was discovered.

The "Summary of the Invention" then proceeds to lay out the scope of the invention itself, and it describes two principal aspects: 1) a pharmaceutical composition; and 2) a method for treating patients with pain, inflammation, and other conditions.   The subsection first states general characteristics of the composition: "The composition contains an acid inhibitor present in an amount effective to raise the gastric pH of a patient to at least 3.5, preferably to at least 4, and more preferably to at least 5, when one or more unit dosage forms are administered."   '996 patent, col.3 ll.33-37.   This subsection then moves from the general characteristics of the composition to some specifics of potential embodiments, teaching about the acid inhibitors and

15

NSAIDs that may be used.

After several paragraphs which teach about potential embodiments of the composition, the subsection turns to the method aspect of the invention, first describing generally conditions that the method may be used to treat. It then presents a general statement about the inventive methods:

> In a more general sense, the invention includes methods of treating pain, inflammation and/or other conditions by orally administering an acid inhibitor at a dose effective to raise a patient's gastric pH to at least 3.5, preferably to at least 4 or and more preferably to at least 5. The patient is also administered an NSAID, for example in a coordinated dosage form, that has been coated in a polymer that only dissolves at a pH of at least 3.5, preferably at least 4 and, more preferably, 5 or greater or which dissolves at a rate that is slow enough to prevent NSAID release until after the pH has been raised.

'996 patent, col.5 ll.36-45. These statements make clear that the inventive method, in general, involves: 1) orally administering an acid inhibitor at a dose effective to raise a patient's gastric pH to at least 3.5; and 2) administering an NSAID with a coating that only dissolves at a pH of at least 3.5. The NSAID must not be released until after the pH has been raised. These are essential characteristics of the treatment method and continue to emphasize the coordinated release and sequential release characteristics of the acid inhibitor and NSAID. The subsection concludes by stating an additional benefit of the method, increasing patient compliance by reducing the frequency of dosing.

Looking at the "Summary of the Invention" subsection as a whole, it describes the fundamental underlying discovery, followed by the two principal applications of that fundamental discovery in the invention, the composition and the treatment method. The subsection contains general statements about each, as well as some specific information about potential embodiments. The subsection makes statements about both the composition and the

treatment which show shared characteristics of the composition and the method. Both the composition and the method share the following characteristics: 1) there is an acid inhibitor present in an amount effective to raise the gastric pH of a patient to at least 3.5; and 2) an NSAID with a coating that does not release the NSAID until the pH of the surrounding medium is 3.5 or higher. These are essential characteristics of both the composition and the treatment method of the invention.

The Specification continues with the "Detailed Description of the Invention" and the Examples. The Detailed Description focuses on the inventive compositions, teaching in greater detail specific information about how to make the compositions. There is, however, one important general statement in this subsection: "All of the dosage forms are designed for oral delivery and provide for the coordinated release of therapeutic agents, i.e., for the sequential release of acid inhibitor followed by analgesic." The comprehensive breadth of the phrase, "all of the dosage forms," may be understood by reference to the Abstract. As already noted, the Abstract states that the "present invention is directed to drug dosage forms," and that the "invention also encompasses methods of treating patients by administering this . . . dosage form." Thus, both the composition and the method involve dosage forms. "All of the dosage forms," then, refers to every embodiment of the invention. Every embodiment of the invention, then, provides for coordinated release and sequential release of acid inhibitor and analgesic.

This Court agrees with DRL that these statements in the common specification of the '920 and '996 patents support the inference that the invention, as a whole, in both aspects as a composition and a method of treatment using that composition, requires a coordinated release dosage form which comprises an acid inhibitor in an amount effective to raise the pH of the gastrointestinal tract, prior to the release of the NSAID, to at least 3.5. "Coordinated release,"

the Specification explains, involves release of an acid inhibitor which can raise intragastric pH to at least 3.5, followed by release of the analgesic, which does not occur until the intragastric pH is at least 3.5.   The invention as a whole is gastroprotective.

DRL argues that Plaintiffs' proposed construction has the effect of including within the scope of the claims at issue formulations which contain esomeprazole which may or may not be effective to increase gastric pH to at least 3.5.   Clearly, Horizon's proposed construction does not require esomeprazole in an amount effective to increase gastric pH to at least 3.5.   This, in turn, DRL contends, would make the claims read on the prior art,[7] which has two adverse effects on the patent.   First, the claims would cover formulations that the specification criticizes, as just discussed.   Second, it would erase a key distinction with the prior art and render the claims invalid.

The first point is a potent argument in support of DRL's proposed construction.   If the claims are not limited to esomeprazole which is effective to raise the gastric pH to at least 3.5, the claims include within their scope formulations in which gastric pH is not raised to at least 3.5.   Horizon does not explain how such a formulation could be distinguished from the combinations of acid inhibitor and analgesic in the prior art.   Such a formulation would have characteristics criticized in the prior art and would lack the advantageous characteristics which the inventor argued distinguish the invention.   First, it would not provide for coordinated

_____

[7] As the Specification states in the "Background of the Invention" subsection, combinations of acid inhibitors and NSAIDS were known in the prior art, but coordinated release of these agents was not known.   '996 patent, col.2 ll.31-38.   As explained in this Court's Opinion denying the preliminary injunction application, during prosecution of the parent '907 patent, the applicant overcame a rejection for anticipation over the Goldman reference by distinguishing Goldman on the ground that coordinated delivery of the acid inhibitor and the analgesic is a characteristic of the '907 invention which is not disclosed by Goldman.   (Opinion and Order of December 18, 2019 at 10.)

release, since the claims state that the naproxen is not released until the medium has a pH of at least 3.5.   Second, it would not provide for reducing intragastric acid levels to a non-toxic level prior to the release of NSAID.   This would appear to eliminate from such a formulation the gastroprotective benefit of the invention.   Such a formulation would have the same properties that the inventor criticized in the prior art and would provide neither the functionality of the claimed formulations nor their benefits, as explained in the Specification.   DRL's expert, Dr. Metz, attested to this.   (Metz Dec. ¶ 87.)

This point alone is strong evidence against any construction that gives the claims coverage of these criticized and distinguished prior art formulations.   Horizon does not effectively address this point in its responsive brief.   Horizon does argue that an inventor "need not claim the resulting properties of their claimed compositions," and cites three Federal Circuit cases, which are instructive.   (Pls.' Resp. Br. 16.)   First, Horizon cites Braintree Labs., Inc. v. Novel Labs., Inc., 749 F.3d 1349, 1355 (Fed. Cir. 2014), in which the Federal Circuit stated: "while cleansing is the goal specifically articulated in the specification, it is not a claim requirement."   This was not stated as a rule of general application, but a conclusion specific to those facts.   In the following paragraph, the Federal Circuit states the general and familiar principle: "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."   Id. (quoting Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1342 (Fed. Cir. 2010)).   When there is clear indication in the intrinsic record that the patentee intended the claims to be so limited – as the Court concludes DRL has demonstrated in the instant case – Federal Circuit law authorizes a claim construction that reads limitations from the specification into the claim.

19

Horizon also cites <u>Purdue Pharma L.P. v. Endo Pharm., Inc</u>., 438 F.3d 1123, 1136-37 (Fed. Cir. 2006), in which the Federal Circuit stated: "Without any specific claim language to interpret, however, the trial court impermissibly imported a limitation into the claims."    Were this the final statement of the Federal Circuit on this issue, Horizon might have a valid point, but <u>Purdue</u> is not the final statement on this issue, but one case in a large body of law.    As <u>Braintree</u> makes clear, a more complete statement of Federal Circuit law on this matter is that, while the general rule bars importing claim limitations from the specification, there are exceptions.    As will be shown in the discussion that follows, <u>Alloc</u> and similar cases demonstrate this to be true: "On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."    <u>Alloc, Inc. v. ITC</u>, 342 F.3d 1361, 1370 (Fed. Cir. 2003).    <u>Forest</u>, to be discussed later, shows that this is still good law.    The third case cited by Horizon, <u>Comark Communs., Inc. v. Harris Corp</u>., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (italics added), states the general rule and leaves room for the exceptions: "particular embodiments and examples appearing in the specification will not *generally* be read into the claims."    The instant case falls within the exceptions to that statement.

3.    The Inter Partes Review evidence

DRL also offers evidence from two Inter Partes Review ("IPR") proceedings involving the '996 patent.    Under Federal Circuit law, such evidence may be considered as intrinsic evidence in the context of a prosecution disclaimer argument, but DRL has not made one. <u>Aylus Networks, Inc. v. Apple Inc.</u>, 856 F.3d 1353, 1361 (Fed. Cir. 2017) ("statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer"); <u>see also</u> <u>Krippelz v. Ford Motor Co.</u>, 667

F.3d 1261, 1266 (Fed. Cir. 2012) ("A patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer.) In the absence of a prosecution disclaimer argument, this Court finds that DRL has failed to show that statements made by a patent owner during an IPR proceeding are intrinsic evidence for purposes of claim construction.

4.    DRL's other arguments

The Court need not parse DRL's remaining arguments because the intrinsic evidence is sufficient to decide the claim construction dispute.   It thus need not consider DRL's arguments about Horizon's purported admissions in this case, nor Horizon's 2014 Citizen Petition to the FDA.

DRL, however, is wrong on one much-disputed point, but it does not make any difference: the Federal Circuit did not decide this issue, or the same issue, in Nuvo.   (See Defs.' Br. 1.)   DRL argues that the "naproxen release limitation" in the claims of the patents presently at issue is "materially the same" as that in the '285 claims that the Federal Circuit construed in Nuvo.   (Defs.' Br. 14.)   This Court concludes that the claim construction in Nuvo is inapplicable to the claim construction issues presently before this Court.   In short, the presence of the word "effective" in the claims at issue in that case – and the absence of that word in the claims in the instant case – provides a material distinction.   DRL recognizes this distinction but minimizes its significance to the vanishing point, and this Court disagrees.   This conclusion does not, however, alter the validity of DRL's proposed construction here, as DRL's position does not rely on Nuvo.   The construction that this Court adopts today does not rely on Nuvo.

This Court notes, however, that Nuvo contains an observation which lends support to this Court's reasoning in this claim construction:

> Claim 1 of the '907 patent expressly states that the PPI, which is uncoated, must be effective to raise the gastric pH to at least 3.5.   Claim 1 of the '285 patent at least impliedly requires the same since the naproxen is only released when the pH reaches at least 3.5 and the uncoated esomeprazole is the only other agent available in the dosage form to achieve that goal.

Nuvo, 923 F.3d at 1378-79.   The Court notes the common-sense observation implied by the Federal Circuit's reasoning: if the claim requires that the naproxen is only released when the pH reaches at least 3.5, how does that happen in this composition, except by the effective functioning of the esomeprazole?   This common-sense observation appears to be applicable here.   Although the language of claim 1 of the '285 patent is quite different from that of the claims presently at issue, the pharmaceutical composition is not different, and all of the claims presently at issue, using varying language, require that release of some naproxen is inhibited unless the pH of said medium is 3.5 or higher.   As the Federal Circuit observed, "esomeprazole is the only other agent available in the dosage form to achieve that goal." Id. at 1379.   As to the patents presently at issue, esomeprazole again is the only other agent available in the dosage form to effectuate the goal of raising intragastric pH to the level at which the naproxen releases. The patents describe no other way to effectuate that goal, but by the esomeprazole effectuating raising the intragastric pH to that level.   This supports DRL's construction.

As to the intrinsic evidence, in opposition to DRL's case, Horizon argues principally that the Specification describes embodiments without the "effective to raise gastric pH to at least 3.5" limitation.   Horizon does not, however, succeed in demonstrating this.

First, Horizon argues that this Court already decided this issue in Horizon's favor in a different case.   Horizon contends that, in 2013, in a previous case involving the '907 patent, Judge Pisano issued a claim construction opinion in which he "concluded that the specification was not limited to dosage forms in which the acid inhibitor increases gastric pH to at least 3.5."

(Pl.'s Resp. Br. 7.)   Horizon does not contend this is the law of the instant case, nor does it make any preclusion argument, and so the Court does not discern the relevance of this argument.

Horizon points to a number of places in the Specification of the patents presently at issue that refer to acid inhibitors without any express qualifying phrases which mean "effective to raise gastric pH to at least 3.5."   Horizon points to a paragraph in which the Specification states ranges for the amounts of acid inhibitor to be used in the formulation.   '996 patent, col.8 ll.7-22. Here, Horizon observes correctly that this paragraph says nothing about whether these amounts are effective to raise the gastric pH to at least 3.5.   The paragraph says nothing about that issue either way.

The key question is: in the cited paragraph, has the specification disclosed embodiments which lack the characteristic, "effective to raise gastric pH to at least 3.5?"   Horizon contends that it has, but Horizon has divorced the paragraph from its context in the specification.   The paragraph in question appears in the Specification section, "Detailed Description of the Invention."  '996 patent, col.6 l.21.   This section begins with this introductory paragraph:

> The present invention is based upon the discovery of improved pharmaceutical compositions for administering NSAIDs to patients. In addition to containing one or more NSAIDs, the compositions include acid inhibitors that are capable of raising the pH of the GI tract of patients. All of the dosage forms are designed for oral delivery and provide for the coordinated release of therapeutic agents, i.e., for the sequential release of acid inhibitor followed by analgesic.

'996 patent, col.6 ll.23-29.   This introductory paragraph is worth special attention because, as already discussed, it so strongly supports DRL's claim construction position.   It could hardly say it more clearly: "**All of the dosage forms** are designed for oral delivery and provide for the **coordinated release** of therapeutic agents, i.e., for the **sequential release of acid inhibitor followed by analgesic**."   As an express definition of the scope of what was actually invented,

this statement leaves *no* room for the existence of dosage forms that lack these characteristics. All of the claims at issue specify that the analgesic is naproxen, and all contain slightly varying language that requires that release of at least a portion of said naproxen is inhibited unless the pH of said medium is 3.5 or higher.   When we combine the requirements stated in this introductory paragraph with the common features of the claims, we see that every embodiment of these claims – *all dosage forms* – provides for coordinated, sequential release of acid inhibitor followed by analgesic, which can only occur if the acid inhibitor is effective to raise the gastric pH to 3.5, which allows the release of the naproxen into a medium with a pH of 3.5.   This is exactly DRL's main point.   And this is the patent's "Detailed Description of the Invention."   It does not leave room for Horizon's hypothetical formulations which lack effectiveness of the acid inhibitor to raise the gastric pH to 3.5.   The invention does not include such formulations within its scope.

Following this introductory paragraph, the Specification discusses the NSAIDS that may be used as the analgesic.   '996 patent, col.6 l.31-col.8 l.6.   It provides detailed guidelines for the dosages of various NSAIDS.   Next is the paragraph on acid inhibitor dosage that Horizon has cited.   Following that is a subsection giving guidance on how to make the pharmaceutical preparations and tablet dosage forms.   '996 patent, col.8 l.23-col.9 l.9.

The "Detailed Description of the Invention" focuses on the composition that is the heart of every claim at issue and gives detailed instructions on how to make the composition.   It begins with the introductory paragraph described above, gives dosages of the ingredients (NSAID and acid inhibitor), and then explains how to make the inventive compositions.   The paragraph that Horizon points to, when read in context, does not have the meaning that Horizon contends.   It does not teach that certain embodiments contain an acid inhibitor which is not

effective to raise the gastric pH to 3.5.   The introductory paragraph has constrained its scope.[8]

Similarly, Horizon makes the same observation about Example 8.   There are two problems with this.   First, Example 8 is clearly focused on the technical details of the manufacturing process for this pharmaceutical composition.   '996 patent, col.19 l.20-col.20 l.22.   Second, Horizon overlooks the very first sentence of Example 8: "The present Example is directed to a coordinated delivery dosage form containing omeprazole and naproxen."[9]   '996 patent, col.19 ll.26-27.   As already explained, the Specification teaches that coordinated delivery, in the context of these patents, requires sequential release of an acid inhibitor effective to raise gastric pH to 3.5 and an NSAID which releases only when the environment is at a pH of 3.5.

As to Example 8, Horizon is unpersuasive: the example does not disclose a formulation which lacks effectiveness of the acid inhibitor to raise the gastric pH to 3.5.   Such a formulation would not be a coordinated delivery dosage form containing omeprazole and naproxen, with immediate release omeprazole and delayed release naproxen, as Example 8 requires, within the meaning of the Specification.

Horizon also points to two places in which the specification refers to "one or more unit dosage forms."   '996 patent, col.3 ll.31-37; col.4 ll.26-33.   Horizon contends that, when considered in view of Judge Pisano's prior claim construction, this conflicts with some of Judge Pisano's findings about the specification.   This Court has already determined that Horizon has failed to provide a legal basis for considering the prior claim construction.

---

[8] Horizon makes the same argument about a sentence in the subsection, "The Making of Tablet Dosage Forms."   '996 patent, col.8 ll.61-63.   The same analysis applies.

[9] Also, the title of Example 8 is "Naproxen <u>Delayed Release</u> and Omeprazole <u>Immediate Release</u> Capsule."   '996 patent, col.23-24 (emphasis added).

In its responsive brief, Horizon tries again, and fails again, to point to something in the Specification that supports its case.   Horizon asserts: "The specification instead describes that it may take more than one dose and several days for acid inhibitors to work and that, without any changes to gastric pH, enteric coated naproxen is released where the pH is above 4, which would be in the small intestine."[10]   (Pls.' Resp. Br. 5.)   To support this assertion, Horizon gives a string cite with three Specification references: '996 patent, col. 2 ll. 3-9; col.9 ll. 37-41; and col. 10 ll. 59-62.   None of these three citations to the Specification, offered in Horizon's responsive brief, supports its contentions about the Specification.

Horizon has failed to demonstrate that the Specification describes embodiments without the 'effective to raise gastric pH to at least 3.5' limitation.   To the contrary, having carefully examined the Specification, this Court concludes that it discloses no embodiments lacking this characteristic, and makes very clear that the scope of what the inventor actually invented is limited by this characteristic.

In the next subsection, Horizon quotes a part of a sentence written by the Federal Circuit, here presented in its complete original form:

> While descriptions "of the 'present invention' as a whole" could limit the scope of the invention, *see Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1308 (Fed. Cir. 2007), "use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references . . . are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent," *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011).

Cont'l Circuits LLC v. Intel Corp., 915 F.3d 788, 798 (Fed. Cir. 2019).   The problem for

---

[10] The Specification contains only one use of the word, "intestine," in the "Background of the Invention," explaining that acid in the upper small intestine is a factor in the development of

Horizon is that it has failed to establish the premise: as just discussed, it has failed to demonstrate that the specification references are not uniform, or that other portions of the intrinsic evidence do not support applying the limitation to the entire patent.   Then Horizon argues: "In several instances, the specification expressly indicates these are descriptions of preferred embodiments, rather than limitations of the invention as a whole."   (Pl.'s Br. 13.)   These preferred embodiments in no way contradict the conclusion already stated.   As already established, the patent repeatedly defines the present invention as having the characteristics stated in the Abstract:

> The present invention is directed to drug dosage forms that release an agent that raises the pH of a patient's gastrointestinal tract, followed by a non-steroidal anti-inflammatory drug. The dosage form is designed so that the NSAID is not released until the intragastric pH has been raised to a safe level.

The preferred embodiments are not exceptions.

The intrinsic evidence just reviewed supports the conclusion that what the inventor actually invented was a composition, as well as a treatment method using that composition, that provides for coordinated, sequential release of an acid inhibitor and an NSAID, which produces gastroprotective benefits because of the coordinated release design: acid inhibitor is first released in the gastrointestinal tract, which raises the pH of the tract to at least 3.5, at which point the enteric coating of the NSAID allows its release into a gastric environment of reduced acidity. The intrinsic evidence supporting this inference is quite strong.   This Court finds that the evidence of record supports DRL's contention about the invention as a whole.

B.    *On the law of claim construction*

Next, this Court considers the question of whether such evidence may, under Federal

---

ulcers.   '996 patent, col.1 l.38-41.

Circuit law, support the construction that DRL proposes, which imports a limitation from the specification.

Horizon argues that DRL's construction has no basis in the language of the claims. Horizon contends that there is no ambiguity in any of the claim language, and that DRL can point to no words in the claim that it seeks to construe. In support, Horizon cites cases such as MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1330-31 (Fed. Cir. 2007), which states:

> [W]e cannot endorse a construction analysis that does not identify "a textual reference in the actual language of the claim with which to associate a proffered claim construction." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999); *see also Renishaw PLC v. Marposs S.p.A.*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[I]t is manifest that a claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description."); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (finding it improper to impose "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim").

Horizon contends that DRL has failed to point to a textual reference in the claim language with which to associate its construction.

This argument intertwines with Horizon's argument that DRL's proposed construction has no basis in Federal Circuit law. Horizon points to the well-established principle that, in the absence of evidence of lexicography or disclaimer, claim terms should have their ordinary meaning, a general and fundamental principle of patent law which no one disputes. See Phillips, 415 F.3d at 1316. Horizon contends that DRL's proposed construction is not premised on ordinary meaning, lexicography, or disclaimer. DRL does not contend that its proposed construction relies on either lexicography or disclaimer.

The parties do not recognize that both argue that their proposed construction is premised

28

on the ordinary meaning of the claim language,[11] but that they differ on what that ordinary

meaning is and how to properly ascertain it.   Thus, Horizon contends that there is no dispute

about the ordinary meaning, when that is the heart of this claim construction dispute.

Horizon's arguments overlook the fact that DRL roots the legal theory of its construction

in Alloc.   In Alloc, the Federal Circuit explained the legal foundation for the decision as

follows:

> [T]his court recognizes that it must interpret the claims in light of the
> specification, *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir.
> 1995) (en banc), *aff'd* 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996),
> yet avoid impermissibly importing limitations from the specification. *Comark
> Communications v. Harris Corp*., 156 F.3d 1182, 1186 (Fed. Cir. 1998).   That
> balance turns on how the specification characterizes the claimed invention.
> *Sunrace Roots Enter. Co., LTD v. SRAM Corp*., 336 F.3d 1298, 1305 (Fed. Cir.
> 2003).   In this respect, this court looks to whether the specification refers to a
> limitation only as a part of less than all possible embodiments or whether the
> specification read as a whole suggests that the very character of the invention
> requires the limitation be a part of every embodiment. For example, it is
> impermissible to read the one and only disclosed embodiment into a claim
> without other indicia that the patentee so intended to limit the invention.
> *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1327 (Fed. Cir. 2002).   On
> the other hand, where the specification makes clear at various points that the
> claimed invention is narrower than the claim language might imply, it is entirely
> permissible and proper to limit the claims.

Alloc, 342 F.3d at 1370.   This provides the foundation for DRL's legal theory.

In Phillips, the Federal Circuit stated: "Properly viewed, the 'ordinary meaning' of a

claim term is its meaning to the ordinary artisan after reading the entire patent."   Phillips, 415

F.3d 1303 at 1321.   This succinctly states the fundamental principle on which DRL has based its

proposed construction.   It is Horizon's legal theory which is problematic: Horizon relies on a

---

[11] For example, at the beginning of Horizon's responsive brief, it states: "Because the tablets
claimed in the '996 and '920 patents are described in the specification and there is no dispute
about the meaning of the words in the claims, the claims should have their plain, ordinary and
customary meaning."  (Pls.' Resp. Br. 1.)   The parties agree on this, and it summarizes the legal

constricted understanding of ordinary meaning that is divorced from the specification, contrary to the clear precedents in Federal Circuit law.   "Claim terms are not construed in a vacuum divorced from the specification."   Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1290 (Fed. Cir. 2010).   Yet, that is exactly what Horizon advocates here, a view of ordinary meaning divorced from the specification.

In DRL's responsive brief, DRL addresses Horizon's difficulties understanding the legal basis for DRL's construction with a very apt citation to UltimatePointer, L.L.C. v. Nintendo Co., 816 F.3d 816, 823-24 (Fed. Cir. 2016).   In that decision, the Federal Circuit wrote:

> UltimatePointer argues that the term "handheld device" has an ordinary meaning not limited to direct pointing and, absent a clear definition or clear disclaimer from the patentee, that plain meaning should control.   Adopting UltimatePointer's "ordinary meaning," however, would incorrectly require us to divorce the claim language from the repeated direct-pointing description and indirect-pointing criticism in the specification.   In *Decisioning.com, Inc. v. Federated Department Stores, Inc.*, we rejected a proposed broad claim construction that was not supported by the specification, although we recognized that the construction was plausible if "[d]ivorced from the specification."   527 F.3d 1300, 1308 (Fed. Cir. 2008) (per curiam).   Even in *Pacing Technologies, LLC v. Garmin International, Inc.*, the main case that UltimatePointer relies on to support its argument, we stated that "claim terms are construed in light of the specification and prosecution history, not in isolation."   778 F.3d 1021, 1024 (Fed. Cir. 2015).   In other words, UltimatePointer's argument that a court may only deviate from the ordinary meaning when there is an explicit definition or disclaimer does not apply because the ordinary meaning of "handheld device," when read in the specific context of the specification of the '729 patent, is limited to a direct-pointing device.

Id. (citations omitted).   The same is true here.   "The only meaning that matters in claim construction is the meaning in the context of the patent."   Trs. of Columbia Univ. v. Symantec Corp., 811 F.3d 1359, 1363 (Fed. Cir. 2016).   These cases provide the resolution for the parties' dispute about ordinary meaning: Horizon appears to have misunderstood the law.

---

basis for the constructions of both.   They may disagree about Alloc, but not about this premise.

As to its legal theory of claim construction, DRL relies on the Federal Circuit's decision in <u>Alloc</u>, and argues that the facts of the instant case are analogous to those in <u>Alloc</u>.   In short, in <u>Alloc</u>, the Federal Circuit held that certain claims should be construed to have a "play" limitation, based on the specification, despite the fact that the word "play" did not appear in the claims.   342 F.3d at 1368-73.   The Federal Circuit began its discussion as follows:

> Turning to the Commission's finding that the claims include a "play" limitation, none of the asserted patent claims recites the term play. Even so, the claims recite floor system features, which are emphasized in the claim language above, in which play is necessarily present. These features, and their associated claim terms, relate to "displacement" and "disassembly."

<u>Id.</u> at 1368.   The Federal Circuit then examined the specification and explained the basis for the conclusions that "play between components of the locking joint permits displacement" and "play in the joint also permits 'disassembly.'"   <u>Id.</u> at 1369.   The Federal Circuit considered the prosecution history, including the prosecution history of a parent application, and stated: "the applicant represented to the USPTO examiner that play facilitated its novel system set forth in the revised claims."   <u>Id.</u> at 1372.   The Federal Circuit found that "play facilitates displacement and disassembly," and concluded: "the patent applicant tethered the displacement and disassembly features of the claims to the play feature."   <u>Id.</u> at 1372-73.   The Federal Circuit held that the claims at issue should be construed to require play.   <u>Id.</u> at 1373.

Thus, in <u>Alloc</u>, the Federal Circuit examined the language of the claims and the intrinsic record and found that a product feature disclosed in the specification, but not in the claims, facilitated and permitted product features that were expressly claimed, in the context of a specification that described that product feature as a characteristic of the invention as a whole. This Court now inquires into whether the instant case presents analogous facts.   DRL argues that the intrinsic evidence demonstrates that the invention, in general, requires that the acid

inhibitor be effective to raise the gastric pH to at least 3.5; this would be the product feature disclosed in the specification.   Two of the four independent claims include the phrase, "release of at least a portion of said naproxen is inhibited unless the pH of said medium is 3.5 or higher," while the other two independent claims include the phrase, "a core layer comprising naproxen, wherein said core layer has a coating that inhibits release of said naproxen from said core layer unless said dosage form is in a medium with a pH of 3.5 or higher."   The product property disclosed in the specification – the acid inhibitor is effective to raise the gastric pH to at least 3.5 – facilitates or permits the product property disclosed in the claims: the naproxen is not released until the pH of the medium is 3.5 or higher.   On the present record, it appears that the patentee tethered the naproxen release feature disclosed in the claims to the effectiveness of the acid inhibitor to raise gastric pH disclosed in the intrinsic record.

Horizon argues that Alloc is distinguishable on several grounds.   First, in Alloc, the patent specification disclosed only embodiments with the characteristic that was found to limit the claims.   In the instant patents, Horizon contends, the Specification discloses some embodiments that have the characteristic of interest, and some that do not.   This Court has already considered Horizon's contention about the Specification and rejected it as unsupported by the evidence: just as in Alloc, the Specification here discloses only embodiments that have the characteristic of interest (coordinated delivery of amounts of acid inhibitor effective to raise gastric pH to at least 3.5.)   Alloc is not distinguishable on this ground.

Next, Horizon argues that Alloc is distinguishable based on the role of the prosecution history.   Horizon overlooks the sentence which begins the Federal Circuit's discussion of the prosecution history in Alloc:

Although the specification alone is sufficiently clear, the prosecution history of

this patent family confirms the description in the specification of each patent, namely, that play is a key feature of the claimed invention.

342 F.3d at 1371.   The Alloc Court stated that the "the specification alone is sufficiently clear." Such is the case here.   Alloc is not distinguishable on this ground.

Third, Horizon argues that Alloc is distinguishable based on the nature of the claims at issue.   Horizon argues, in short, that the limitation imported into the claims in Alloc had a linguistic anchor in the claim language that is absent here.   This argument fails for two reasons. First, it fails to comprehend the essence of the Alloc Court's reasoning, which was presented in a paragraph previously quoted in this Opinion.   That was the paragraph that highlighted the tension between interpreting the claims in light of the specification, while avoiding impermissibly importing limitations from the specification.   That was followed by this statement: "That balance turns on how the specification characterizes the claimed invention." 342 F.3d at 1370.   Neither this sentence, nor the paragraph in which it appears, mentions the need for a linguistic anchor in the claims.   Rather, the Alloc Court focused on what the specification teaches about the invention as a whole.

This is not to say that the Alloc Court did not look at the claim language and include it in its analysis.   In its conclusion to the analysis, the Court wrote: "the patent applicant tethered the displacement and disassembly features of the claims to the play feature."   342 F.3d at 1373. Earlier, the Court stated:

> [N]one of the asserted patent claims recites the term play. Even so, the claims recite floor system features, which are emphasized in the claim language above, in which play is necessarily present. These features, and their associated claim terms, relate to "displacement" and "disassembly."

342 F.3d at 1368.   The words "displacement" and "disassembly" do not appear in the claims at issue in Alloc.   Rather, these words reflect "features" that the Court concluded are "associated"

with certain claim terms.    Id.    As to the question of a linguistic anchor in the claim language, the Alloc Court did not require more than that: features that are conceptually associated.

This leads to the Court's second reason why Horizon fails to distinguish Alloc on the claims: Horizon has not demonstrated that, in the instant case, the relationship between the limiting feature described in the specification and the language of the claims is distinguishable from that stated in Alloc.    In the instant case, an amount of acid inhibitor which is effective to raise gastric pH to at least 3.5 is a feature of the invention described in the specification, and it is "associated" with a claim term in an obvious way: the claims require esomeprazole, an acid inhibitor.[12]

Horizon has failed to distinguish Alloc.

DRL further justifies its theory of claim construction by pointing to a number of additional cases, the newest of which is Forest Labs., LLC v. Sigmapharm Labs., LLC, 918 F.3d 928, 933 (Fed. Cir. 2019), in which the Federal Circuit stated:

> Although claim 1 does not expressly refer to buccal or sublingual administration, the claims "must be read in view of the specification, of which they are a part." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).    "When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention."    *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).    Here, the '476 patent states "[t]he invention relates to a sublingual or buccal pharmaceutical composition," '476 patent at 1:6-7, strongly supporting the district court's construction.    That construction is further supported by additional language in the specification, which explains the benefits of sublingual and buccal treatment over the prior art. *Id.* at 1:33-34. . . .

Appellants suggest that this improperly reads a method step into the claim by

---

[12]  In the preliminary injunction decision, this Court found that "the patentee tethered the naproxen release feature disclosed in the claims to the effectiveness of the esomeprazole to raise gastric pH."    Horizon Meds. LLC v. Dr. Reddy's Labs., Inc., 2019 U.S. Dist. LEXIS 218330, at *24 (D.N.J. Dec. 18, 2019).    This is still true, and, also, the patentee more obviously tethered effective functioning of the acid inhibitor to esomeprazole itself, a word in every claim at issue.

requiring a particular method of administration, namely sublingual or buccal. The specification, however, repeatedly uses "sublingual or buccal" to modify "composition," indicating that these are properties of the composition itself.  *See, e.g., Id.* at 1:6-7.

We have considered Appellants' remaining arguments as to claim construction and find them unpersuasive. Given the claim language and the language in the specification, we hold the district court properly construed claim 1 to be limited to buccal and sublingual formulations.

A key question before this Court is: is the present situation analogous to <u>Forest</u>?   Is there a meaningful difference?   At the outset, the Court observes that Horizon chose to respond to DRL's arguments about <u>Forest</u>, and other cases supporting DRL's approach to construction, in one long footnote in which, rather than discussing or distinguishing any of the cases, it offers only a long string cite of cases accompanied by brief parenthetical summaries of the relevant holding.   (Pls.' Resp. Br. at 4 n.2.)   Horizon does not even try to distinguish <u>Forest</u>.

In short, this Court does not discern any basis to conclude that the approach to claim construction affirmed in <u>Forest</u> is not analogous to the instant dispute.   Instead, the similarities are striking.   The claim construction at issue in <u>Forest</u> concerned a claim, claim number 1, for a pharmaceutical composition comprising a compound also known as asenapine.   918 F.3d at 932. Claim number 1 in <u>Forest</u> includes this language: "wherein the composition is a solid composition and disintegrates within 30 seconds in water at 37° C."   <u>Id.</u>   The district court construed claim 1 to include "a limitation to sublingual and buccal formulations."   <u>Id.</u>   This Court notes that none of the key words in that construction, "sublingual," "buccal," or "formulations," appears in the claim at issue in that case.   The Federal Circuit stated that "sublingual" and "buccal" refer to characteristics of the method of administration of the pharmaceutical composition, which the patient may place under the tongue (sublingual) or in the cheek cavity (buccal).   <u>Id.</u>

35

The Federal Circuit began its claim construction analysis by observing that, while claim 1 did not expressly refer to sublingual or buccal administration, the claim must be read "in view of the specification," citing Phillips. Id. at 933. The Federal Circuit reviewed the intrinsic evidence and concluded that the specification did indeed describe the invention as a whole, that it limited the claims to sublingual and buccal formulations, and the Court affirmed the district court's construction. Id. In the instant case, the Specification provides as much evidence as the Federal Circuit found to be sufficient in Forest, if not more. Forest is analogous to the instant case and its application strongly supports DRL's proposed construction.

Finally, the Court observes that, *a propos* of Horizon's concerns about a linguistic anchor in the claim, the Forest Court held:

> Appellants suggest that this improperly reads a method step into the claim by requiring a particular method of administration, namely sublingual or buccal. The specification, however, repeatedly uses "sublingual or buccal" to modify "composition," indicating that these are properties of the composition itself.

Forest, 918 F.3d at 933. The Court notes that, in Forest, the linguistic anchor was simply the word "composition," which also appears at the claims at issue here. Similarly, the Specification contains a number of statements like this one: "The present invention is directed to pharmaceutical compositions that provide for the coordinated release of an acid inhibitor and a non-steroidal anti-inflammatory drug (NSAID)." '996 patent, col.1 ll.25-28. As in Forest, such statements expressly state that the coordinated release of the acid inhibitor and the NSAID are properties of the composition itself. Moreover, the claims at issue all contain language requiring release of an acid inhibitor, esomeprazole. DRL's proposed construction is directed to a property of the release of that acid inhibitor.

DRL has persuaded this Court that Alloc and Forest are analogous and provide a basis for

36

its proposed construction in Federal Circuit law.

Having considered the arguments and the evidence, this Court returns to the guidance of the Federal Circuit in Renishaw and the question of what the inventor actually invented.   The Court finds that the Specification of the '996 and '920 patents consistently and compellingly demonstrates that the inventor actually invented pharmaceutical compositions that provide for coordinated release of an acid inhibitor and an NSAID.   The patent titles, Abstracts, and the entire Specification repeatedly characterize the essence of the inventive compositions in line with two sentences in the first paragraph in the "Detailed Description of the Invention:"

> In addition to containing one or more NSAIDs, the compositions include acid inhibitors that are capable of raising the pH of the GI tract of patients. All of the dosage forms are designed for oral delivery and provide for the coordinated release of therapeutic agents, i.e., for the sequential release of acid inhibitor followed by analgesic.

'996 patent, col.6 ll.25-30.   Horizon has pointed to no evidence that this is not the essence of what the inventor actually invented.   The Specification consistently explains that the inventive coordinated release dosage forms all contain an acid inhibitor effective to raise the gastric pH to at least 3.5, and an NSAID that does not release until the environment has a pH of at least 3.5. The effectiveness of the acid inhibitor to raise the gastric pH to at least 3.5 plays an essential and pivotal role, because, as the Specification consistently states, the release of the NSAID is coordinated with it: the NSAID is designed not to release until the acid inhibitor has had this effect.   This is the essence of the coordinated release characteristic here.   This is what the inventor actually invented: if you do not have a composition with an acid inhibitor that is effective to raise the gastric pH to at least 3.5, in a coordinated release, sequential release formulation, you do not have what Dr. Plachetka invented.   The coordinated, sequential release of the acid inhibitor, which raises gastric pH to at least 3.5, followed by release of the

enteric-coated NSAID into the less acidic environment, are the essence of what the inventor actually invented.

This Court acknowledges the fact that, as Horizon contends, the Federal Circuit has often cautioned courts to exercise great care when finding that the specification implies a limitation to the claims.   Nonetheless, Federal Circuit law, in cases such as <u>Alloc</u>, authorizes such an outcome when the specification justifies it.   As the Federal Circuit stated: "when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."   <u>On Demand Mach. Corp. v. Ingram Indus.</u>, 442 F.3d 1331, 1340 (Fed. Cir. 2006).   Such is the case here.

While this Court agrees with Horizon that the language of the claims in <u>Nuvo</u> differs significantly, because the claims as written contain the word, "effective," DRL does not need <u>Nuvo</u>, nor the prosecution history, to support its case.   In the instant case, the Specification provides more than enough evidence to support DRL's theory of claim construction.   As in <u>Alloc</u> and <u>Forest</u>, this is the unusual case in which the evidence in the Specification is so clear, consistent and strong that it limits the claims at issue.

Horizon attempts to support its proposed construction with three principal arguments: 1) DRL has no valid theory of claim construction, despite <u>Alloc</u>; 2) <u>Alloc</u> is distinguishable; and 3) the Specification does not consistently define the invention as limited by the requirement that the acid inhibitor be effective to raise gastric pH to at least 3.5.   Horizon has failed to persuade this Court on any of these key points.   To the contrary, this Court finds that DRL has demonstrated both that <u>Alloc</u> and <u>Forest</u> are analogous and provide a valid legal basis for Defendants' proposed construction, and that the Specification consistently defines the invention as limited by

38

the requirement that the acid inhibitor be effective to raise gastric pH to at least 3.5 as part of a coordinated release, sequential release formulation.

The Federal Circuit has held: "When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  <u>Verizon</u>, 503 F.3d at 1308.   The Court concludes that the Specification describes the features of the "present invention" as a whole, and that description is expressly and consistently limited to compositions which contain an acid inhibitor effective to raise gastric pH to at least 3.5.   This description limits the scope of the claims.

As to the question of whether the preambles should be amended and found to be limiting, as proposed by DRL, this Court finds that DRL has failed to persuade this Court to adopt that construction.   As to the question of whether and how the Specification limits the claims at issue, this Court adopts DRL's proposed construction.   Because the scope of the invention is limited to compositions which contain an acid inhibitor effective to raise gastric pH to at least 3.5, and because the claims at issue specify that the acid inhibitor in the composition is esomeprazole, this Court construes all claims at issue to require esomeprazole which is effective to raise gastric pH to at least 3.5.   Thus, the relevant phrase in claim 1 in both the '920 and '996 patents means: at least a portion of said esomeprazole is released regardless of the pH of the medium, *and is effective to raise gastric pH to at least 3.5*; the relevant phrase in claim 11 of the '920 patent and claim 12 of the '996 patent means: a layer comprising esomeprazole, *effective to raise gastric pH to at least 3.5.*

**SO ORDERED.**

_____s/ Stanley R. Chesler_____
STANLEY R. CHESLER, U.S.D.J.

Dated:   August 14, 2020